[No. 11202.  *En Banc.*  January 11, 1915.]

*In the Matter of the Estate of* SARAH J. BROWN.
GEORGE H. GODFREY *et al., Appellants,* v. NELLIE
WATERHOUSE *et al., Respondents.*[1]

WILLS—CONTEST—FORGERY—EVIDENCE—SUFFICIENCY. In a contest of a will on the ground of forgery of the testatrix's signature, evidence examined and found to sustain the finding of the lower court in favor of the validity of the will (CHADWICK and FULLERTON, JJ., dissenting).

Appeal from a judgment of the superior court for Spokane county, Hinkle, J., entered June 19, 1912, upon findings in favor of the defendants, in a will contest, tried to the court. Affirmed.

*Scott & Campbell,* for appellants.
*Ira Honefenger* and *Hamblen & Gilbert,* for respondents.

MAIN, J.—This action was instituted for the purpose of contesting the will of Sarah J. Brown, deceased. After the issues had been framed, the cause was tried before the court sitting without a jury. Findings of fact and conclusions of law were made, and a judgment entered sustaining the validity of the will. From this judgment, an appeal is prosecuted.

The will purports to have been executed on the 14th day of January, 1910. On January 16, 1911, Sarah J. Brown,

[1]Reported in 145 Pac. 591.

the testatrix, died.   The will was found and produced on or
about the 15th day of December, 1911.   Subsequent to the
death of Mrs. Brown, and prior to the date of the finding of
the will, the estate was being administered upon.   After the
will was found and produced, it was admitted to probate on
January 23, 1912.   Thereafter, and on January 30, 1912,
the present action was instituted.

The will, after making certain specific bequests and devises,
gives the residue of the property to two adopted sons, and
the nieces and nephews of the testatrix, share and share alike.
The two adopted sons, who by their guardian *ad litem* are
the contestants in this proceeding, were adopted during the
year 1902, when they were 5 and 6 years old, respectively.
They were sons of Mrs. Brown's brother, Clarence B. God-
frey and his wife.   After their adoption they continued to
reside with their parents as before.

The statement of facts in this case covers a little more than
650 pages.   Also there are many exhibits.   Most of these,
however, are documents containing the admitted signatures
of Mrs. Brown, offered in evidence for the purpose of com-
parison with the signature upon the will.   There is no ques-
tion in the case other than one of fact.   In none of the briefs
is there a single law book cited.   The ultimate question is,
whether the signature upon the will is that of Mrs. Brown.
The testimony, not only upon this primary question, but upon
the collateral questions, is in conflict.   Every page of the
statement of facts has been carefully read and the exhibits
have all been examined.   The signature upon the will has
been compared with the admitted signatures, under a hand-
glass, and also under a microscope.   Taking into considera-
tion all the evidence in the case, we are of the opinion that
there is not only insufficient evidence to justify the reversal
of the trial court upon a finding of fact, but that the evidence
affirmatively shows that the judgment of the trial court was
right.   To enter upon a review and discussion of the evidence

would unduly extend this opinion, and would serve no useful purpose. Where the question is solely one of fact, the opinion is not valuable as a precedent.

The judgment will be affirmed.

CROW, C. J., MOUNT, PARKER, MORRIS, and GOSE, JJ., concur.

ELLIS, J., took no part.

CHADWICK, J. (dissenting)—I dissent. This case was originally assigned to me. I believe I took it with an open mind. I have given it more care, more thought, and more study than any other case ever submitted to me for my judicial opinion. I took the case primarily to affirm. I could not put an affirmance on paper, nor do I believe that it would be possible to make a detailed statement of the case and draw the conclusion that the court has drawn. The only way to affirm the case is to pass it without argument, saying that, taking the case by its four corners, we find there is a conflict of evidence and the court is not prepared to say that the evidence preponderates against the decree of the lower court.

Judge Main has read the record with conscientious care and zeal, and he has drawn the conclusion that, upon the whole case, the decree should be affirmed. I, too, have read every page of the statement of facts, and reread the greater part of it. I, too, have examined the exhibits and put the disputed signatures under a reading glass and a high power microscope. I have done my work and shall avail myself of the privilege of giving reasons which, in my judgment, sustain my opinion that the purported will of Sarah J. Brown is a forgery.

Sarah J. Brown went to the city of Spokane about the year 1889. She engaged in dressmaking and made some investments in real estate which proved profitable, so that at the time of her death, which occurred on the 16th day of January, 1911, she had accumulated an estate which was appraised at about $40,000. Mrs. Brown possessed an unusual

aptitude for business, and was careful and methodical in all of her business habits. She had transacted her business .through an attorney for more than twenty years. During that time, Mr. D. W. Henley, Messrs. Henley and Scott, and Mr. Scott, now of counsel for the contestants, did her legal business. She kept her valuable papers in a tin box which she deposited in her lawyer's vault. Judge Prather, an attorney of respected standing, had done some little business for Mrs. Brown many years ago. He has an indistinct recollection of drawing a will, but no showing is made that would warrant us in holding that Mrs. Brown, during the twenty years of her active life in Spokane, ever consulted, except in the most remote instances, any lawyer other than Mr. Henley or Mr. Scott for guidance or advice. In the years 1891-1893, Mrs. Brown acted as administratrix of the estate of Benjamin F. Whipple, deceased. This is noted for two reasons: To show that Mrs. Brown was familiar with the ways of the law and of law offices, and because many of her signatures have been gathered from the files of that case and have been offered as evidence in this one.

Clarence B. Godfrey, a brother of Mrs. Brown, and his wife, Etta B. Godfrey, have two sons, George H. Godfrey and Frank B. Godfrey. Mrs. Brown seems to have had an affection for these children, and in October, 1902, at a time when they were five and six years old respectively, she adopted them as her own, with the consent of their parents. She attended to and met the expense of their schooling. When not in boarding school, the boys remained with their parents. It seems to be proven beyond the peradventure of a doubt that the only object Mrs. Brown had in adopting the boys was to see to it that they had proper instruction and to make them her lawful heirs. Her relationship to the boys was not changed during her lifetime, and they were her legally adopted children at the time of her death. Mrs. Brown was of the age of about sixty-four or sixty-five years at the time

of her death. She had ever been of sound mind and alert to her business interests.

After the death of Mrs. Brown, search was made for a will. None was found in her tin box, where inquiry was first and most naturally directed, nor was any found at her home. Mrs. Etta B. Godfrey, the natural mother of the adopted sons of Mrs. Brown, was appointed administratrix, and proceeded to administer the estate until the purported will was admitted to probate. A contest was thereafter instituted by the natural father of the adopted sons, who are also parties contestant, and by their guardian *ad litem*. The trial judge found that contestants had failed to sustain their petition, and decreed the proposed will to be the last will and testament of Sarah J. Brown, deceased. An appeal to this court is prosecuted.

Contestants assert the will to be a forgery because, first, the direct testimony shows that she had no will; second, concomitant circumstances show the proffered document to be false; and third, the paper (a) shows forgery upon its face, and (b), by a preponderance of the credible testimony of the opinion witnesses and of the experts in handwriting, it is shown to be such.

Mrs. Nellie Waterhouse and Mrs. May Pixlee are daughters of Lucinda L. McFarlane, a sister of Mrs. Brown. Mrs. McFarlane died about two months before Mrs. Brown passed away. Certain real property which Mrs. Waterhouse claimed as her own, but for which Mrs. Brown had probably furnished the whole consideration, was in Mrs. Brown's name when she died. She also held the note of Mrs. Pixlee for about $800. A brother of these women, George L. McFarlane, also owed a note to the estate. Mrs. Waterhouse and Mrs. Pixlee expected that Mrs. Brown would devise the property and absolve the note in her will. It seems fairly certain from the testimony that Mrs. Waterhouse and Mrs. Pixlee were bitterly and even angrily disappointed because their aunt had not released their obligations and had not distributed her

property, especially some diamonds, by will, in the way they thought she should have done. They seem to have entertained the idea that if the adoption of the boys were set aside they would obtain an advantage over the other heirs, and they talked with Mrs. Godfrey, and a lawyer was consulted with reference to vacating the order of adoption. The testimony is very conflicting upon this item as to which one of the parties was the mover. Mrs. Waterhouse and Mrs. Pixlee say that Mrs. Godfrey suggested it. She denies it and insists that the other women suggested it. But it is certain that the matter was discussed and that Mrs. Waterhouse and Mrs. Pixlee were extremely anxious that it be done. The Godfreys were not unwilling that Mrs. Waterhouse should have the property claimed by her, and a friendly suit was begun by Mrs. Waterhouse against the administrator, and a decree so holding was entered. There seems to be no doubt of the fact that Mrs. Brown had often said that she intended that "Nellie" should have the property, and it seems to be about as certain that she held the property in her own name in order to protect it from the consequences of habits less thrifty than she knew herself to possess. Mrs. Pixlee was insistent that she should be given her note without payment. She made at least one, and possibly more, trips from her home at Ephrata with the avowed purpose of demanding the note. A final demand was made on the administratrix about December 8, 1911.

At this time, Mrs. Pixlee suggested to Mrs. Godfrey, the administratrix, that it had been Mrs. Brown's intention to put the name of a deceased brother on Mrs. McFarlane's tombstone. Neither Mrs. Godfrey nor Mrs. Pixlee knew the date of his death, and Mrs. Pixlee assumed to look for it among her mother's old papers. About December 15, at the home of Mrs. Waterhouse, in the presence of Mrs. Olson, a neighbor, and Miss Jenkins, who say they were asked to "Come over" and hear some music on the phonograph (one of these witnesses also testifies to an anxiety on the part of the sis-

ters to have another lady present), Mrs. Waterhouse and Mrs. Pixlee brought out an old red wallet stuffed full of old papers belonging to their mother.   The papers number one hundred and eleven and are wholly irrelevant to any issue in this case.   The wallet was tied in an old newspaper stained with the mark of a coffee cup.   Mrs. Waterhouse testified that, on the Saturday before Mrs. Brown's death, she took the old red wallet from Mrs. Brown's house, where Mrs. Brown had had it, for the purpose of looking through her deceased sister's papers; that the papers were scattered over a small center table and over Mrs. Brown's desk; that she gathered them up and wrapped them and the wallet in an old newspaper which Mrs. Brown had laid upon the small table upon which she was accustomed to eat her meals; that there was a stain of coffee upon it.   Her theory is that, in gathering up this wallet and wrapping it in the newspaper, she picked up the envelope containing the will.   Resuming now our narrative, Mrs. Pixlee started to look through the papers, and "all at once" she dropped them on the floor.   In picking them up, she or Mrs. Waterhouse "happened," out of the whole number of papers, to pick up an envelope, blank with the exception of the words "my will" written dimly across one end in lead pencil.   Mrs. Pixlee says she said, "Why, mother had a will."   Mrs. Olson took it out of her hand and examined and read it.   Miss Jenkins testifies to the discovery of the will as follows:

"State to the court what was said and what was done in the finding of this will?   A.   Mrs. Pixlee said that, looking at some old pictures of people back east put her in mind of an address that Mrs. Godfrey wanted to find in some old letters, and she spoke to Mrs. Waterhouse about looking those old letters over, and she said, 'Should I look them over tonight or should I take them home with me?' and I think Mrs. Waterhouse said do just as she was a mind to; and she said— Mrs. Pixlee said again to Mrs. Olson, she said, 'What would you do?' and Mrs. Olson said, 'Why,' she said, 'I would look part of them over and if I got tired I would take the rest of

them home with me.' And so she was looking them over, and when she unwrapped them in this newspaper there was a mark where the cup had sat, a cup of tea or coffee had made a mark on the table cloth, and so I had my attention drawed to it; she said, 'This is one of Auntie's table cloths; you can see where the cup sat on it,' and I noticed it, and she drawed Mrs. Olson's attention to it, and she noticed it, and I think then was when Mrs. Waterhouse said, 'I must burn those— them in the stove,' or something like that, she said, and she made a grab for them; she was sitting across the room, and she made a grab for them and knocked them out of Mrs. Pixlee's lap, and if I remembered right the first letter, the first envelope, Mrs. Pixlee picked up, it had across the end of it, 'My Will.' Mrs. Pixlee held it up, and she says, Mrs. Pixlee said, 'There is the lost will; auntie has made a will;' and she handed it to me, and I don't remember if I opened it or handed it back to her and she opened it, but I remember I was the first one to open the will inside the headings unfilled in and I opened it and I said, 'The last will and testimony of Sarah J. Brown,' and I just dropped it on the floor; I said, I don't want nothing to do with it;' and I think Mrs. Pixlee picked it up and said, 'Maybe no one ought to read it; we ought to take it to a lawyer' and Mrs. Olson says, 'Yes, we will read it; it won't do any hurt,' and she took it and started to read it and I think one of them grabbed it away from her, and she grabbed it back again and read it, and she read it aloud a couple of times so we all heard it."

The will was carried to the attorneys for Mrs. Waterhouse and was afterwards offered for probate.

One of the witnesses to the will, George A. Griffeth, had known Mrs. Brown for more than twenty years. He is a farmer living west of Spokane, and is the father-in-law of George McFarlane, one of the beneficiaries under the will. W. C. Lavender, the other witness, says that he did not know Mrs. Brown, although Griffeth says he (Lavender) had met her on at least one occasion at his home. Lavender does not remember the circumstance. Lavender was a friend of Griffeth of more than twenty years' standing. The two witnesses to the will substantially agree that they were met by Mrs.

Brown (although Lavender says that not knowing her, he does not swear that it was in fact Mrs. Brown) on Riverside avenue near McNabb's drug store, and were asked by her to step into the drug store and witness her will; that they went into the store and, in the northeast corner, at a place provided for the convenience of customers, the three of them signed the document. Lavender says it took "just a minute, just long enough to sign it up." This is a significant fact to which we will refer later. Lavender further testifies that he remembers the signer of the will as a woman between "forty and fifty;" that she did not appear to be old, and that she acted like she was in good health. Griffeth also says that she seemed to be in good health, although there can be no question that at about that time (the most of the month of January) she was laid up with rheumatism and unable to walk. Lavender says he never saw the woman after that time.

Another incident relied upon by proponents is testified to by Judge Prather, who says, in substance, that sometime within the year or two then just past, some man whom he does not now remember, came to him and exhibited a typewritten draft of a will, and asked him whether it was in legal form. He replied that it was, whereupon, his visitor told him that he had been sent there by Judge Prather's old friend, Mrs. Sarah J. Brown, who thought that because of old friendship he would make no charge for his advice.

Testimony is also offered tending to show that Mrs. Brown had intended to square all debts and obligations owing by her nieces and nephew, but it is nowhere made to appear that she ever manifested, by word or deed, an intention to discharge their debts and at the same time make them residuary legatees of equal standing with her adopted sons. There is much testimony tending to show that Mrs. Brown had said that she had done all that she intended to do for her sister's children. On this feature of the case, the testimony neutralizes itself.

Would a woman be apt to make a will under the circumstances, and act with reference to it as it is alleged Mrs. Brown did, in the light of the following facts? She was an accomplished business woman, "smart," of mature thought and careful business habits. She had been accustomed, both before and after the date of the alleged will, to do her business through her attorneys. The making of a will was no new thing to her,—it seems to be agreed by all that she had made a will some years before. It was a subject that was often discussed by her. There was no reason why she should go about it in a mysterious way, or work through the instrumentality of some man who appears on the scene and makes his exit from the stage without revealing his identity. To be called upon to act upon such a delicate mission, the party must have been an old friend of Mrs. Brown's and if so, he would probably have been known, either personally or by reputation, to Judge Prather. The record reveals no like instance where Mrs. Brown depended upon others to attend to her affairs. She was on sufficient terms of intimacy with her own lawyer to loan him money, and if the plea be urged that she sought to save a fee by sending the draft of her will to an attorney by the hand of a stranger for approval, it may be answered by saying it is more probable that her own attorney would have answered her question without fee than one who had gained no profit from her in a business way. Mrs. Brown was not close or stingy. The record shows the contrary. She was generous, rather than grasping. She had been very liberal with her sister's children. The contested will was undoubtedly drawn by a lawyer, or from a legal form, and it seems improbable, in the light of all the other circumstances attending the execution of the will, that Mrs. Brown, the methodical business woman, would have had it drawn by a lawyer other than her own. If she desired the advice of another lawyer, it is more likely that she would have gone to him herself. It would be utterly contrary to her habit and her life history in Spokane to charge her with

going to some lawyer who cannot now be found, and whose work she had not sufficient confidence to accept without further assurance, and then to resort to the unusual method of passing a matter of that magnitude through the hand of a third party to be assured of its validity.

Then, again, the case touches the doctrine of probabilities in this: considering Mrs. Brown's business training, she would in all probability have executed and obtained witnesses at the time and place where the will was drawn and there closed the transaction and put it away for safe keeping, for if we say it is her will, the form of it must have been satisfactory to her; there are no corrections or interlineations; although her sister is called "Lydia" instead of Lucinda, by which name she was known, and her nephew and nieces are named without the initials, which she ordinarily used. Instead of doing the usual, ordinary and natural thing, we find that she went out on the highways with intent to call witnesses from the bystanders, and just happened to meet Mr. Griffeth and his friend Lavender, and then went into a public drug store to execute the will at a desk, or place to write on the counter. The two witnesses are not at all clear which it was; but, whichever it was, it was not there, as is shown by several disinterested witnesses, employees in the drug store. It had been removed some months before the date of the purported will. The witnesses do not remember whether they or Mrs. Brown sat down or stood up to sign the document. A most striking circumstance is, that instead of then going to the repository where her private papers were kept, a place safe from intrusion and fire, and where those interested would naturally look for such a document at the time of her death, she left it around her home for nearly a year, so carelessly that it found its way into a pile of rubbish. The old pouch is full of Sunday school cards, rewards of merit, clippings, business cards, advertisements, letters, etc., unimportant and inconsequential things such as youth gathers and sentiment

retains with growing strength as age creeps on. Mrs. Water-
house says her mother never destroyed anything.

The finding of the will under circumstances that were so
unusual as to call for some explanation, puts suspicion upon
it.   The women who happened in or were called in, both agree
that Mrs. Waterhouse and Mrs. Pixlee were urgent in their
request that they tell the lawyers that they were not invited
to be at Mrs. Waterhouse's at the time the will was found.
One of them says that she was told that she would receive
$100 if they won the case and established the will.   All of
these things, and others which might be mentioned, when
coupled with the fact that Mrs. Brown had been generous
with Mrs. Waterhouse and Mrs. Pixlee and George McFar-
lane, the children of her deceased sister; the fact that she
adopted her brother's boys to make them her heirs, as is testi-
fied by many disinterested witnesses; the fact that she had
had a will before the adoption, and thereafter and up to the
time of her death had said frequently to many third parties
who have no interest in the case, as well as her own attorney
as late as November, 1910, that while she had had a will, she
had destroyed it, fearing that a will might be broken; the
fact that, during her last sickness, when asked by the doctor,
at the solicitation of Mrs. Waterhouse or the Godfreys (they
are not agreed as to who suggested it), about her affairs and
whether she had a will, she expressed her impatience and dis-
pleasure, saying she could attend to her own affairs; the fact
that the greater number of the witnesses agree that Mrs.
Brown was confined to her home about the time the will was
executed, unable to walk about the house or to the toilet
because of a swollen foot and rheumatism, and that it is im-
probable that she was able to be on Riverside avenue in ap-
parent good health on the 14th day of January, brings me to
a consideration of the signature of the will.

Having detailed the facts in a general way, and keeping
in mind the interest of the proponents who discovered the will,
I come to a consideration of the signature and date line of

the will, resolved to weigh the testimony with unusual care and as independently of the circumstances just recited as I can, although probabilities and incredibilities must of necessity enter more or less actively into the consideration of the questioned signature.

The law of questioned documents, if it may be called a settled branch of the law, is an interesting subject. There may be signatures which will pass the scrutiny of a careful eye, yet under the microscope or when superimposed upon or juxtaposed with an authenticated signature, the most careless observer will admit to he bald, even clumsy forgeries. Where, after the usual tests of observance and microscopal examinations, the witnesses are of different mind, a judge to whom the issue is submitted must resort to his own judgment, and from the conflict of opinion, the maze of circumstance, and a comparison of the questioned signature with all the authenticated ones, endeavor to extract the truth. To accomplish this, we, like the experts who have disagreed, must go over the same ground, employ the same tests, and by processes of inclusion and exclusion, come to some opinion. Our field broadens, for unlike many of the witnesses who hold an authenticated signature in one hand and the questioned document in the other and, by mere comparison or reference to pictorial effect, express an opinion, we are compelled to consider the disposition, the character and characteristics, the motives and purposes, the health, the very life history of the one whose writing is offered even to its minutest detail; to measure probabilities, and, finally, if there be a probability one way or the other, to consider it in the light of the opinions. We must measure the witnesses, their experience, their interest, their attitudes, their apparent candor or lack of candor, their ability to judge, their opportunities to know the signature offered, their mental characteristics, the extent of their examinations and comparisons. It is our duty to observe to what extent an opinion upon scientific subjects or questioned hypotheses may be influenced by that bias and

partisanship which in many, if not in most all such cases, influences, possibly in an unconscious way, the opinions of those who testify or may have testified in pride of opinion or in consideration of an unusual fee. We must give weight to the experts in proportion as we think the reasons given for their opinions are good reasons or bad reasons. Osborn, Questioned Documents, 258.

Waiving for the time the opinions of the experts and others, and approaching the question, as I believe, with an open mind and with a sincere purpose to try the case *de novo* (*Hunt v. Phillips*, 34 Wash. 362, 75 Pac. 970), I first submit an enlarged copy of the questioned signature and the attendant writing "Jan. 14th."

(2) The questioned signature and twenty-eight signatures taken haphazard from checks written in the years 1909-1910.

(3) Three signatures written in 1891-1893. These were taken from the public files in the county court house in the case of Whipple, deceased, and are presented to illustrate two points which I shall presently make.

(4) A memorandum written by Mrs. Brown. This is offered to illustrate figures 1 and 4 and the figures 1 and 9.

(5) A letter showing the several characteristics of Mrs. Brown's handwriting. It is written on paper of about the same weight and texture as the paper upon which the questioned signature is found, and is valuable as a basis for comparison. Attention is called to the dots and punctuation marks, and the figures in the date line.

(6) A note made Dec. 5, 1910, showing general characteristics and the signature of Mrs. Brown.

(7) A check, the last one drawn before the date of the will, also a check drawn Aug. 13, 1909, showing ragged and heavy letters. The heaviness of the letters and figures in this check, apparently due to bad ink or pen, is submitted for comparison with the laying on or retouching of the letters in the questioned document.

II.

this _14th_ day of _June_ Nineteen Hundred and Ten 19(10).

*Sarah J Brown*

OR ORDER

Twenty five DOLLARS

*(columns of repeated signatures "Sarah J Brown")*

III.

IV.

quit Claim     Sold to Mr B

Lots 21. 22, 23. 24 Blk 3

5. 6. 13. 14. B. 4

Warranty Deed
to

Lots 1. 2. 3. 4. 8. 9. 10. 15. 16. 17 B 4

To Scott L. 23. 24. B. 4     To Hubert Barton

O Barton = 19    B. 4     Lots 11 and 12. B 4

M Pixlee = 1. 2. 3 B. 3

G McFarlane = 13. 14. 15 B. 3

Brandt = 7. 8 B. 5

(544)

Spokane June 25, 1910

Dear Cousin

yours recd I was a way from home so just got it now my Dear if you wont to come out here and live with me I will give you and Baby a home and clothe you both and will send you a through ticket, and it wont cost you any thing will pay your expences back if you wont to go any time if you get homesick I dont think but you will like it I keep House by my self may have my Sister with me

## VI.

Spokane Dec 5th 1910

Three months after date without grace I promise to pay to Otto Voss, the sum of seventy five dollars with interest at the rate of eight per cent per annum until paid for value received

Case 6482 Sarah J Brown

## VII.

SPOKANE, WASH. Dec 31 1907 No. 45

EXCHANGE NATIONAL BANK
SPOKANE, WASH.

PAY TO _____ OR ORDER $188.02/100

One hundred eighty eight 02/100 DOLLARS

J Brown

SPOKANE, WASH. Aug 13th 1902 No. 35

EXCHANGE NATIONAL BANK
SPOKANE, WASH.

PAY TO C. C. Huntington OR ORDER $57.65/100

Fifty Seven and 65/100 DOLLARS

Sarah J Brown

(546)

From these documents, selected at random from the scores I have examined, I think it may be fairly set down that Mrs. Brown betrayed certain fixed characteristics.

(1)   She wrote an angular hand.  The principal experts for contestants say that the questioned signature was made by one who used the muscular movement.  The principal expert witness for the proponents says that it is a combined muscular and finger movement.  Both are right.  The signature is a combination of the two, but is made by one who used the muscular movement.  I find nothing in the writings of Mrs. Brown that even suggests that she ever wrote a free, full muscular hand, or a combination of the muscular and finger movement.  Mr. Fearon, an important expert witness for the proponents, says Mrs. Brown's writing was wholly finger movement.

(2)   She wrote a nervous hand.  Her hand was at times "shaky."  The letters "a-r-a" in the disputed signature betray neither of the two characteristics mentioned.  They are full fashioned, with perfect curves, and in themselves betray a familiarity with the Spencerian copy book hand of a generation ago.

(3)   In writing her signature, Mrs. Brown stuck to *the* line or to *a* line, as writers using a finger movement almost invariably do.  In the few instances in which we find either "Sarah" or "Brown" above the line, the name is on the line or a line.  We find no signature describing the sweep of a circle from the letter "S" to the letter "n" as does the proffered signature.  With her cramped finger movement, she could not have made such a sweep.

(4)   Mrs. Brown made the letter "J" with two strokes of the pen.  This is admitted by both principal experts.  Her hand was not taken from the paper on either stroke.  In the questioned document the "J" in "Jan." shows in the enlarged photograph, and under the microscope at least four primal movements and as many, if not more, patches.  In the initial "J" there are at least three primal movements.  The upper

part of the true J's is narrow. The disputed J's are round or oval rather than long and sharp. They are neither characteristic, nor are they sustained by reference to any of the examples set before us.

(5) Mrs. Brown rarely closed the first "a" with the up and down stroke. She habitually left the second "a" open with a loop at the top of the first stroke. In the few instances where she closed the second "a" the first up and down strokes are made with the same loop movement and not as it is in the questioned signature.

(6) The letter "r" is characteristic. I ask a comparison of the r's in the questioned signature and in the admitted signatures shown on plate 2. The "r" in Sarah does not compare with any "r" in any of the writings. The "r" in Brown is more characteristic, but when examined under a powerful microscope, it so clearly shows a careful reconstruction that it is worthless as a basis of comparison.

(7) It was the habit of Mrs. Brown to close the "o" in Brown. Whether she did, or did not, do so, the first stroke of the "o" is habitually made with a loop or a loop movement. The "o" in the questioned signature is not characteristic. I submit a comparison of it with the "o's" to be found in other writings and pass it as needing no further reference.

(8) The first upstroke of the capital "S" describes an arc, whereas, this movement in Mrs. Brown's signatures more nearly approaches a straight line. The loop is wider and does not resemble any made by her.

(9) Mrs. Brown carried the last stroke of the "w" in Brown, this she made like "u," or the first stroke of "n," as it may be, upward, and inclined to perpendicular. In the questioned document, it is inclined to the horizontal so radically that it distinguishes the line from any that has been submitted for our inspection. The run from the "w" to the "n" is markedly greater than in any of the other signatures, and greater than one would expect to find in the handwriting of one who is writing with a finger movement.

(10)    She made the last stroke of her "a's" with a down
or perpendicular stroke, a finger movement.   This is found
in every "a" I have examined.   The "a" in "Jan." lacks
this characteristic.   Not only does it not return to the line,
but goes on to the first movement in the latter "n" by a hori-
zontal stroke.   Compare this "a" with the full fashioned per-
fect "a's" in the disputed Sarah and with the "a's" in the ad-
mitted signatures.   If the several "a's" were written by the
same person, it seems unlikely that they were written at the
same time and under the same conditions, as testified by the
witnesses to the will.

(11)·  The upstroke and the last movement in the letter
"n" in "Jan." are clearly round and curved and were written
by one having a muscular movement.

(12)    Mrs. Brown habitually made the horizontal stroke
in the figure four with an upstroke or movement, and when
she used it at all, which was not frequent, as habitually
made the horizontal dash under the abbreviation "th" or
"nd" with a downstroke.   I cite the violation of these
characteristics in the figure fourteen.   Mrs. Brown made the
perpendicular lines in 1 and 4 nearly straight up and down.
In the questioned document they are less perpendicular than
in any we have in the exhibits, and they show the easy, fin-
ished line of a Spencerian muscular movement.

Mr. Lavay, in his little work on disputed handwriting,
says:

"The little things are the ones that count most in making
examinations and determining a forgery for the reason that
they are no less characteristic than the more prominent pecu-
liarities and are more likely to· be overlooked by the person
who tries to disguise his hand.   The crossing of t's and the
dotting of i's become matters of large moment in making com-
parisons of disputed handwritings.   There is probably no
matter in conjunction with a man's ordinary writing to
which he gives less thought than the way he makes these
crosses and dots.   For that reason they are in the highest
degree characteristic.   And it is precisely because of their

apparently slight importance that the person who sets out to imitate another's handwriting or to disguise his own is likely to be careless about these little marks and to make slips which will be sufficient to prove his identity."

It seems to be admitted that a person will make his terminals and punctuations with less consciousness than other parts of his writings. Consequently we find in terminals and punctuation marks a greater fixity of habit than is ordinarily present in other parts of writings.

(13)    Bearing this in mind, it will be noticed that, in addition to the constancy with which Mrs. Brown adhered to certain loops, angles, movements and pen lifts, perhaps her most striking characteristic is found in the formation of periods and dots. Note the period following the initial J. This period is a dot. Under the microscope it is slightly horizontal. I have examined the periods in the exhibits submitted and the dots over the i's and am prepared to say that Mrs. Brown invariably made them, either by striking a slight perpendicular line or nearly so, or a slight curve to the right. Reference to the exhibits, especially the letter, which I have copied, illustrates this point. Moreover, no period is found after the initial J in any of Mrs. Brown's later signatures. So far as the record shows a period had not been used by her after the initial for nearly twenty years. I am not unmindful of the fact that Prof. Blair says that a period appears in one of the checks, and that counsel for contestants in putting a question to the witness may or may not have admitted this to be true. My own judgment is that no such period appears. In a check of date April 23, 1910, there is a pen mark which might be taken for a period, but I am convinced that it was never so designed by the writer. A period appears in some of the signatures found in the Whipple estate, 1891-1893. See Plate 3. These papers were public records and available to any interested party.

(14)    In Mrs. Brown's writing there is a pen pressure from the beginning to the end of every word, with no hair

lines or designed shadings.   Her letters, and shadings if used, were made in a natural way.   Under the microscope, Mrs. Brown's writing is heavy.   In the questioned document, the upstroke of the S, the letters a-r-a, and the letter h, with the exception of the last part which is patched, are easy and flowing without pen pressure, and what may appear to be shadings are, in the main, retracings over a lighter line.

(15)   It was not Mrs. Brown's habit to patch letters.   In some instances there is a showing of a patch or retracing of some letter, betraying a purpose to complete the letter and not to finish it, so as to conform to her usual signature. There is a carelessness in it.   There is no attempt to follow the lines of imperfect letters, whether made by bad ink or running out of ink.   The many patches on the questioned writing follow with scrupulous care the original line, with the exception of the downstroke in the letter J in "Jan." where the ink seems to have run beyond the original border, and in the lower part of the same J where the first downstroke was carried lower and the point of the first line was abandoned.

(16)   Mrs. Brown's S's and J's were as characteristic as the features on the face of a person.   Whereas, the J in "Jan." and the J initial are so different from any of the authenticated J's and to each other as to make it extremely improbable that they were written by the deceased.

(17)   Mrs. Brown had the habit of ending the downstroke of the figures 1, 4, 7 and 9, with a slight turn to the right or a slight hook turning to the right.   These lines were invariably made with pen pressure.   In the two downstrokes in the figure 14, neither of these characteristics are apparent.

(18)   I note the fact that the witnesses to the will say that the signing was the work of but a moment.   The purported signature bears indisputable evidence that it could not have been the work of a moment.   Although Mrs. Brown wrote without hair lines or designed shadings, the retracings and building up of letters and lines betray a care and method

that must necessarily have taken some considerable time and attention.

(19)   I have not discussed the pen lifts or pen propulsions because it is difficult to do so without immediate resort to the microscope.   It is enough to say that the disputed writing contains many more pen lifts than in any made by Mrs. Brown.

It is a fact that a person will never write his signature twice in the same way.

"It is more surprising, at first thought, to be told that no person ever signs his name even twice alike.   Of course, theoretically, it cannot be said that it is impossible for a person to write his name twice in exactly the same manner.   A person casting dice might throw double aces a hundred times consecutively.   But who would not act on the practical certainty that the dice were loaded long before the hundredth throw was reached in such a case?   The same reasoning applies to the matter of handwriting with added force, because the chance of two signatures being exactly alike is incomparably less than the chance of the supposed throws of the dice.

"Probably many persons will not believe that it is impossible for them to write their own name twice alike.   For them it will be an interesting experiment to repeat their signatures, say, a hundred times, writing them on various occasions and under different circumstances, and then to compare the result.   It is safe to say that they will hardly find two of these which do not present some difference, even to their eyes, and under the examination of a trained observer aided by the microscope, these divergencies stand out tenfold more plainly."
Lavay, Disputed Handwriting, 99-100.

But it is also a fact that there are general characteristics, certain singularities, formations, features, proportions and spacings, which are adhered to in greater or less degree which cannot be portrayed in words, but which nevertheless mark with unerring accuracy the pencraft of a certain individual. We are fortunate in this case in having many signatures for comparison, and equally fortunate in finding that Mrs. Brown's writing was not a flaccid, characterless hand.   It

fairly breathes character,—character so fixed that it is not concealed by a slight palsy of the fingers or the twinges of rheumatism, from which she suffered.

The books seem to agree that a person may lapse upon some of the characteristics of a fixed hand, and his signature could not for that reason be challenged, but just as an actor cannot simulate the voice, so a forger cannot simulate the sum of a writer's characteristics. It is the lack of these that may mark a forgery, however cleverly it may be executed. A person may omit some of his characteristics and his signature be real. A forger may make an accurate, or fairly accurate, copy or simulation of a signature and it may be as devoid of expression as a death mask or the face of a graven image. A person cannot simulate the characteristics of another's writing without betraying his own. There are strong characteristics in the proffered writing, which, under the microscope, are as noticeable as the features on a man's face. They are not Mrs. Brown's.

There is another element that is regarded by the writers on questioned documents as important. That is physical condition. The proffered signature is smoother, rounder, less nervous than any of the signatures of Mrs. Brown. It shows no evidence of infirmity. Compare it with the signature made December 31, next before January 14, 1910, and with "Jan." Its fullness and its freedom, the delicate lines and fashioned curves, especially in the letters "ara," indicate health and self-possession. By the great weight of the evidence, Mrs. Brown was sick with rheumatism during the winter and almost, if not all, of the month of January. Her foot was so swollen that she could not walk. She was waited on by neighbors. Yet we are asked to hold that on Jan. 14th she appeared to be a woman of forty or fifty years and was on the streets unattended, in apparent good health, capable of writing "ara" without a tremor, and, barring the Jan. and the two J's, the signature as a whole better than ninety-nine men in a hundred who are accustomed to writing could write

it. Rheumatism is an erratic master, as we all know, but it is not probable that he practiced such deception in his harvest month of January.

It is the opinion of Mr. Henley, a lawyer of quick and accurate perceptions, who did business for Mrs. Brown for many years, that the signature is a forgery, and of Mr. Gardner, paying teller of the Exchange National Bank, where she had her account, that it is not. Of Mr. Tiffany, paying teller of the Traders National Bank, where she formerly had an account, that the signature is spurious, and of Mr. Vincent, cashier of the Old National Bank, that he "believes" it to be genuine. Others differ in a like way. In passing upon the qualifications of the opinion witnesses, it should be borne in mind that Messrs. Gardner, Scale and Vincent, witnesses for the proponents, did not use any glass or express their opinions except upon general appearances. As one of the witnesses says, "general impressions," and as Mr. Vincent says, "experience," "instinct" and "general character." This witness further says that it is the custom of banks to pay on sight without making an analysis, and he held his theory good by refusing upon the stand to draw a comparison between the questioned document and an authenticated signature.

"I cannot conceive of an opinion worthy of consideration, for which a reason cannot be given; yet we have often heard such opinions given in court, and they have been accepted as expert testimony. When asked for his reason, one witness, a bank cashier, replied, 'Oh! I am so impressed; I cannot tell why.' It is scarcely creditable to any witness to express opinions for which he can give no reasons, or to a court to permit such to be given as expert testimony. For how can court and jury place the proper value upon opinions unsupported by reasons? Indeed, the value of expert testimony consists mainly in the ability of the witness, by reason of his special training and experience, to point out to the court and jury such important facts as they might otherwise fail to observe; and in so doing, the court and jurors are enabled to exercise their own vision and judgment respecting the co-

gency of the reasons, and the consequent value of the opinion founded thereon." Ames, Forgery, 91.

It is only fair to say that Mr. Vincent disavows any of the qualifications of an expert.

It will be seen, therefore, that, after all, the opinions of these witnesses are of no greater benefit to us than our own opinion would be when based on casual inspection and comparison of writings.

Two experts of local fame and of ability, a Mr. Thompson for the contestants, and Professor H. C. Blair, for the proponents, are the important witnesses on this phase of the case. Mr. Thompson is attacked because of certain answers which it is said mark an egotism and conceit that makes his testimony incredible. Counsel for proponents express regret that the remarks of the trial judge, when deciding the case, are not in the record so that we can understand just how this witness was regarded by him. It may be true that the manner of the witness overcame the trial judge, but it affords no legal ground for the rejection of his testimony. Egotism, although always annoying, may be an asset or it may be a liability. It may be a vice or it may be a virtue. It all depends upon what is behind it; whether the victim can sustain himself. If the work and opinions of egotists were to be rejected because of the sole quality of egotism, many chapters of our history, both ancient and modern, would have been unwritten. I have read and reread Mr. Thompson's testimony. I have followed it through every letter and every exhibit referred to by him, and having in mind that it is the writing and not the man that is on trial, and that no client should be scotched because he has an egotist for an expert, I find, notwithstanding, that his opinion is well sustained and its force is amply demonstrated. Mannerisms may sometimes invite prejudice, when the assurance is only confidence or faith in one's opinion and which the assertive one stands ready to prove.

I believe Mr. Thompson sustains his opinion that the signature "Sarah J. Brown" is a forgery. To follow the thread of his testimony and that of Prof. Blair would run this opinion, not into pages, but into a volume, and I shall not undertake to do so. Suffice it to say that, in my judgment, Prof. Blair's opinion is not sustained. A reading and rereading of his testimony makes it certain that he occupied the only vantage ground there is in this case for the proponents, that is, to take the disputed signature, note the marked departures from fixed characteristics, and by search, find a verified letter here and there which corresponds in some degree with a questioned letter. By this test we fail utterly to get a perspective of the whole case and all the writings, and by reference to remote exceptions seek to establish a rule. We give no credit to fixed characteristics, and admit that they may all be violated within a range of two words, as they are in the proffered signature. Mr. Blair has found the few and rejected the many in an effort to find something like, for instance, the wide loop in the S, the Spencerian "a" and "r," the closed "a's" and the lack of the loop in the second "a." The fact that the wide loops and several pen strokes in the two J's are unlike anything that is acknowledged to be real, does not in any way challenge Prof. Blair's interest, although he says Mrs. Brown made her J's with only two strokes. He admits that the number of pen lifts is an important test upon which the authorities are agreed, and that he was informed that there was evidence of twenty-eight pen lifts in the disputed signature, whereas Mrs. Brown was accustomed to make less than ten pen lifts, yet he did not count or compare them in any way. Mr. Blair did not examine for the loop in the letter "a," although he admits its importance. He admits that the photographic enlargement of the questioned signature has every evidence of being retouched and that the J's are retraced, yet he did not examine other J's for evidence of retracings and retouching, and he admits that he found no other J that "came anyways near

like it." Mr. Blair used a glass of more than ordinary strength, but did not use the microscope, which he does not seem to favor in his examinations. Mr. Tiffany speaks of the use of a glass. Assuming that he did not use a microscope but pursued the same methods employed by Mr. Blair he comes to an entirely different conclusion. In such cases, resort to a microscope seems essential. I have used a glass and a high powered microscope, and have found both of these instruments to be of great assistance in leading me over the doubtful places.

"The ends of justice are always served when means are provided to show the facts more clearly. The microscope provides such means and is simply indispensable if the facts in certain disputed document investigations are to be clearly shown; and a great variety of questions which it alone can answer arise in connection with a study of the various phases of forgery. In many instances its evidence is conclusive, and without such assistance as it gives we may indeed have eyes and see not." Osborn, Questioned Documents, p. 72.

Taking Prof. Blair's testimony as a whole, and without it the proponents' evidence on this phase of the case is weak indeed, I think the witness has looked only to the pictorial effect of the writing and has been deceived, for I will admit that the similarities pointed out by him may be found in the writings. No theory would be sound that depended upon a copper plate duplication of a signature. In fact, it would be evidence of the highest character that the duplication is a forgery. We may frankly admit that a departure from characteristics may be found in every signature. But no signature is offered, nor would any stand the test, where all of the exceptions concur to the exclusion of all of the habitual characteristics of the writer. Similarity alone proves nothing. Proponents seem to have assumed that it was incumbent on the contestants to prove the signature to be different from the true signature of Mrs. Brown, and have apparently made their case upon that assumption, whereas I under-

stand its similarity is admitted. The object of every forger, and this the court must keep in mind, is to make the signature seem true; to make it so as to deceive the eye. We expect to find form, otherwise the work of a forger would be futile. Forgeries are detected by other things. In this case, the writer of the questioned signature was more accustomed to the use of a pen than was Mrs. Brown. In doing his work he wrote the name, especially the letters "arah" and the letter "r" in Brown, better than Mrs. Brown ever wrote them or could have written them. His skill is his undoing. Measured through and through, Professor Blair's testimony is no more than an opinion such as any of us might express. Mr. Thompson's testimony goes further and when aided by the scientific methods of photography and microscopy, amounts to a demonstration. He is fully supported by Mr. Tiffany.

On the whole, the expert testimony preponderates in favor of contestants, and proves, with as much certainty as such testimony can, that the signature is false and forged, and this conclusion coincides with the impression made upon my mind by an examination of the documents in the record. As said in *Sharon v. Hill*, 11 Sawyer 290, 9 West Coast Rep. 1:

"The signature to the declaration is a good general imitation of the plaintiff's, and without special observation might easily pass for his."

After noting the differences in the signature proposed in that case, the court continues:

"And besides, and over and above all these particulars, there is a difference in the general effect and appearance of the signatures that is more readily felt than expressed.

"One may see at a glance that two pictures, which have a general similarity, are not portraits of the same person, when it might be difficult to give a satisfactory reason for the conclusion. The disputed signature is evidently the work of a skillful penman. The lines are comparatively smooth and steady, while the exact contrary is characteristic of the plaintiff's writing. Indeed, I very much doubt if he could write such a signature as the one to the declaration."

I have passed, for the sake of brevity, many circumstances and comparisons that might have been made in support of my argument. In passing them it is not out of place to say that I have been impressed by the fact that among the great number of checks submitted by proponents for the purpose of comparing signatures, I find some written in every month of the year except January, for Mrs. Brown was a ready check writer. Inasmuch as she invariably used an abbreviation when writing the longer months of the year and must have used the abbreviation "Jan." such checks would have been invaluable for comparison.

Neither have I referred to the showing made upon a motion for a new trial. This being a trial *de novo* and certain letters there submitted being identified, I might have considered them, but have found enough to convince me without referring to the fact that, in answer to a letter written on Jan. 14th, 1910, by a relative in the east, Mrs. Brown replied on the 24th day of February, saying that she had received the letter in due time, which I may assume was about three days after the 14th, and that the letter "found me laid up with the rheumatiz, the first time for years—am better now but can't go out yet."

Counsel, in their zeal, have undertaken to fix responsibility for the forged will. The insinuations of counsel for contestants are met by proponents' counsel by suggestion of counter theories. It is not incumbent upon us to theorize or say who wrote the signature of Mrs. Brown to the will, nor is the record sufficient to warrant us in doing so if we were so inclined. However, in justice to the witness Lavender, it is but right to say that it is my belief that he was deceived by some person assuming to be Mrs. Brown.

From all of the opinions, from an inspection and comparison of all of the exhibits, after nearly four weeks of closest application, looking at the whole case from all its angles, I am prepared to say that the proffered writing is not the sig-

nature ° of Sarah J. Brown.    The decree of the lower court should be reversed.

FULLERTON, J.—I concur in the opinion and conclusions of Judge Chadwick.