[No. 32418. Department Two. September 11, 1953.]

*In the Matter of the Estate of* ANTON MAYER, *Deceased.*
HELMA GULLILSTAD *et al., Appellants,* v. CONRAD L. KROMM,
*as Administrator with the Will Annexed, et al.,*
*Respondents.*[1]

*Gladys Phillips,* for appellants.

*Orville Peebles, Ray DeKraay,* and *Lester Stritmatter,*
for respondents.

DONWORTH, J.—This is an appeal from a decree dismissing
a petition contesting a will dated January 13, 1951, on the
ground of forgery. Appellants are the sister-in-law and

[1]Reported in 260 P. (2d) 888.

brothers-in-law of the deceased, Anton Mayer. They had been named sole legatees under his earlier will but were not mentioned in the questioned will by which the deceased devised his entire estate to respondent Emma C. Holeman.

The cause was tried to the court sitting without a jury. At the conclusion thereof, the court took the matter under advisement. Thereafter, a memorandum opinion was filed, in which the court stated that appellants had failed to sustain the burden of proof required of them and held that their petition should be dismissed.

The court entered findings of fact, conclusions of law, and a decree dismissing appellants' petition contesting the will. Appellants' motion for a new trial was denied.

The evidence in this case was extensive and often conflicting. Much of it related to the deceased's friendship, or lack of friendship, with Mrs. Holeman and the care she gave him following his wife's death. We do not deem it necessary to review this testimony in detail. The pivotal issue was whether or not the signature on the second will was that of the deceased. On that issue, the opinions of the two experts who testified were in direct conflict.

The undisputed testimony showed that, following the death of his wife in 1946, the deceased lived alone for several months. He had no known living relatives. He was employed as a common laborer by the P.U.D. at Aberdeen, and at the time of his death was about sixty-eight years old.

Undisputed medical testimony established that in the latter part of his life Anton Mayer was suffering from Parkinson's disease, or paralysis agitans, which is characterized by palsy and a marked tremor of the hands. This disease affected his ability to write legibly, as was shown by many samples of his handwriting admitted in evidence.

About 1948, he began to board at the home of Mrs. Holeman. He paid her sixty-five dollars a month for his board and occasionally paid her additional sums for small favors which she performed for him. During January and February, 1950, the deceased was confined to the hospital for several weeks. Following his release Mrs. Holeman cared

for him in her home for some time. During this period, he secured the necessary form from a friend and secretly changed the beneficiary named in his one-thousand-dollar group life insurance policy by making Mrs. Holeman the sole beneficiary. This change was effective as of July 5, 1950. His condition improved enough so that he was able to resume work, and his death on January 15, 1951 (two days after the execution of the will), was unexpected.

A will dated January 30, 1947, was found in deceased's safe deposit box following his death. This will (leaving his entire estate to appellants) was admitted to probate on April 13, 1951. Later, a will dated January 13, 1951, purportedly signed by Anton Mayer and properly witnessed, was found in his home under the circumstances hereafter related. This will revoked all prior wills and left the deceased's entire estate to Mrs. Holeman. It was admitted to probate as the last will and testament of Anton Mayer, and this contest was instituted by appellants, who alleged that the will was a forgery, and that Emma Holeman had conspired with the subscribing witnesses to have the purported will admitted to probate.

Appellants' evidence tended to prove that: the deceased had promised his wife just prior to her death that he would leave his entire estate to her relatives. He kept his promise by making the will dated January 30, 1947. He corresponded with her relatives, who lived in Norway, at frequent intervals, exchanged gifts with them, and in other ways evidenced interest in their welfare. He told several witnesses that he had left everything to his wife's relatives, and they testified that he had never mentioned changing his will. Although he took his meals with Mrs. Holeman because she was a good cook and it was convenient, he said that she was "bossy" and in November, 1950, stated to a friend that she sometimes became angry with him and cursed him. He then purportedly said, "If she ever tries to step in and claim anything you step in and see that she doesn't try to get anything more, because I am paying her plenty."

Appellants' evidence also tended to establish that Mrs.

Holeman discovered the will of January 13, 1951, during a search of the deceased's home, made at her request, in the presence of appellants' attorney and the executor named in the 1947 will. The executor's testimony regarding discussions with Mrs. Holeman prior to this search and discovery of the second will is too long to quote in full, but his description of her actions at the deceased's home is as follows:

"Q. Will you describe now the manner in which Mrs. Holeman made her search? A. She lifted corners of the rugs, looked under the rugs, and looked under the cushions in the settee in the front room, in the living room. There was also a magazine rack there with papers in it which she searched. Q. Did she make a careful search in the living room? A. A casual search, I would say. Q. A casual search? A. A quick search, I would say. She was very excited. And in the front room there was a small chest or steamer trunk, which we opened. And it contained, oh, postal cards, and nick-nacks, and things which were Mr. Mayer's wife's belongings. She searched through those hastily, and then went into the kitchen, searched the kitchen; search the closet in the hallway. Q. Was her search in the kitchen careful or casual? A. Well, I made the search in the kitchen, opened the drawers, and so forth, and then I invited Mrs. Holeman to look also, and she said, 'Well, you looked through there,' and she took my search more or less. Then I went into the bedroom and I searched the closet, where a suit was hanging, and I went through the pockets of it; and also searched a trunk that was in there, which contained a few clothes and a few papers. At that time, Mrs. Holeman came in and she looked at the mattress that was on the bed,—there were no bed clothes over it except the mattress and springs— rolled that back and looked through it. At the end of the bed against the wall was a magazine rack, oh, 3 or 4 shelves in it, full of old magazines. I had looked through those and I thumbed those and I thumbed the pages. I had not located anything. Mrs. Holeman said, 'Well, I am going to take one more last look.' And she searched these magazines and then down on the shelf at the bottom she reached down and pulled out a magazine, shook it and said, 'What's this,' and an envelope fell out of it. She gave it to me, and it was addressed to me, and I handed it to you and you said it was a will. Q. Mr. Kellogg, what did Mrs. Holeman say when the contents of that will was made known to her? A. She said, 'Oh, I will have a heart attack.' She said, 'Dear old

Anton! He did keep his promise. My faith is restored in humanity,' or words to that effect. Q. Mr. Kellogg, at any time during that search in the Mayer residence, did Mrs. Holeman tell you or me, in your presence, that Nathan Schaffer and Audrey Schaffer had witnessed a will in which she was the sole legatee, or words to that effect? A. Not while we were making the search. Q. She did not tell us that there was supposed to be a will in which she was to be the beneficiary? A. No. Not during that search. Q. Just one more question, Mr. Kellogg. How long did this entire search take? A. Oh, I would judge about 20 minutes or so —25 minutes."

For a week after his death, Mrs. Holeman had a key to the front door of Anton Mayer's home. She then turned it over to the executor. The back door had no bolt, and the lock could be opened with an ordinary pass key.

Appellants point out that no evidence was produced to show who drew the will, which was prepared by filling the blanks in a mimeographed form with a typewriter which had small type. The will designated a particular attorney to probate the estate but misspelled his last name. There was no evidence that the deceased had ever consulted this attorney on any matter. The will named the same person as executor as the one designated in the will of January 30, 1947.

Appellants attempted to impeach the testimony of the two attesting witnesses (a barber and his wife) as to the circumstances surrounding the execution of the will. The barber testified that he and his wife had previously agreed to serve as witnesses and that the deceased came into the barbershop around noon on January 13, 1951, and asked them to witness the will in question.

Appellants' evidence tended to show that the deceased was either in a restaurant or an art store at the particular time that the attesting witnesses said that the will was executed in their barbershop.

Respondents' evidence tended to prove the following:

The deceased had never seen his wife's relatives. For some time following his wife's death, he lived a secluded life and prepared his own meals. He was pleased when he

was able to take his meals with Mrs. Holeman, who lived nearby. Besides fixing his meals, she took him to church, picked him up at work when it was raining, and frequently took him for drives in her car. She visited him while he was in the hospital, nursed him at her home for several weeks following his release, and in other ways was kind and considerate. Several witnesses testified that he spoke well of her, appreciated her kindness, and mentioned on several different occasions that he was going to change his will in her favor. The last such statement was made to the married daughter of the attesting witnesses only a week or two before his death.

Both of the subscribing witnesses testified that they were present at the time in question and witnessed the signing of the will, and that the deceased properly executed it in their presence. They both stated that the deceased made them promise not to mention the will until it became public, and both testified that they had no knowledge of the prior will until it was described in the newspaper. One of the witnesses explained that the failure to mention the will to Mrs. Holeman was due to this promise, and that after the prior will was made public Mrs. Holeman was notified by the witness of the later will in her favor. Mrs. Holeman then instigated the search which resulted in its discovery.

Appellants' assertion that the will was a forgery is based very largely upon the expert testimony of Mr. Seth Taylor, who was employed by the Seattle police department and was in charge of the check detail in that city. He described at length his qualifications and experience as a handwriting expert and, by the use of numerous known signatures of the deceased and many enlargements thereof, explained in detail the methods used to test the authenticity of the signature on the will in question. As a result of these tests and studies, he testified that, in his opinion, the signature on the will was not that of Anton Mayer.

Respondents' expert on handwriting was Dr. Charles P. Larson, who was a consultant to the Tacoma police department on handwriting matters and also a practicing physi-

cian specializing in pathology. He also described his qualifications and experience in handwriting analysis. He testified that appellants' attorney had first consulted him to obtain his opinion as to the authenticity of the signature on the will. He reported on the basis of authentic handwriting samples furnished to him that the signature was valid and not a forgery, and that, in his opinion, the writer was suffering from a severe neurologic disease, probably Parkinson's disease.

Dr. Larson testified with the aid of known signatures of the deceased and enlarged photographs thereof and said that, in his opinion, the signature was valid, and that the dissimilarities which were noticeable could be due to the palsy from which the deceased suffered. He concluded that it would be most difficult to forge the signature of a man suffering from Parkinson's disease.

Appellants' expert testified in rebuttal as to the reasons for his opinion that Dr. Larson's conclusion was incorrect.

In support of their first assignment of error, appellants make the statement that, this being a case of equitable cognizance, it will be tried *de novo* on appeal. This is no longer the rule. Since the adoption of Rule on Appeal 43 (34A Wn. (2d) 47), effective January 2, 1951, there has been no distinction between our method of reviewing the record in equity cases and in law cases tried to the court. *In re Boundy's Estate,* 40 Wn. (2d) 203, 242 P. (2d) 165; *Hubbell v. Ward,* 40 Wn. (2d) 779, 246 P. (2d) 468; *Wygal v. Kilwein,* 41 Wn. (2d) 281, 248 P. (2d) 893; *Simpson v. Hutchings,* 41 Wn. (2d) 287, 248 P. (2d) 572.

It should be noted that Rule 43 has twice been amended to emphasize the change. The present appeal is governed by the last amendment, effective January 2, 1953.

Appellants contend that the trial judge erred in entering finding of fact No. 3, wherein he placed more credence in the testimony of Dr. Larson than in that of Mr. Taylor, because Dr. Larson was both a handwriting expert and a doctor of medicine who had made a study of psychology and neurology.

■ The trial judge, who had the witnesses before him, was in the best position to determine their credibility and the weight to be attached to the testimony of each. After examining the record we are unable to say that the evidence preponderates against this finding. See *In re Dand's Estate*, 41 Wn. (2d) 158, 247 P. (2d) 1016, and *Peterson v. Schoonover*, 42 Wn. (2d) 621, 257 P. (2d) 209.

Appellants claim error was committed in entering finding of fact No. 4, in which the trial court stated that, after a review of the testimony of all the witnesses and after a personal examination of all the many exhibits with the use of a magnifying glass, he felt that appellants had failed to sustain the burden of proof required of them.

■ Where a will rational upon its face has been admitted to probate, our statute, RCW 11.24.030 [*cf.* Rem. Rev. Stat., § 1387], imposes upon those who contest its legal force the burden of proving its invalidity. The case of *Dean v. Jordan*, 194 Wash. 661, 79 P. (2d) 331, cited by appellants, does not change the statutory rule. There the will was attacked on the grounds of lack of mental capacity, fraud, and undue influence. It was held that the ultimate burden of proving the invalidity of the will rested on the contestants, but that there was sufficient evidence of insanity and suspicious circumstances surrounding the will to shift to respondents the burden *of going forward with the evidence.* Here the testator's mental state was not in issue, and the burden of proving the invalidity of the will on the ground of forgery was on appellants throughout.

■ The trial court was required to decide upon conflicting evidence one ultimate question of fact, to wit: Was the signature on the will genuine? From our examination of the record and the exhibits, we are unable to say that the court erred in finding that appellants failed to sustain their burden of proof. The ultimate issue of fact therefore was correctly answered in the affirmative. See *In re Brown's Estate*, 83 Wash. 528, 145 Pac. 591.

■ Finally, appellants contend that the trial court erred in stating in its memorandum opinion that Mrs. Holeman

(who was not related to the deceased) was the natural object of his bounty. The findings of fact upon which the conclusions of law and the decree dismissing the petition were based contained no such finding. Where there is a discrepancy between a memorandum decision and the findings of fact, the latter control. *High v. High,* 41 Wn. (2d) 811, 252 P. (2d) 272.

For the reasons stated above, the decree dismissing the petition must be, and hereby is, affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.